**MONROE M. TAPPER AND ASSOCIATES**

v.

**The UNITED STATES.**

**No. 329–70.**

United States Court of Claims.

March 19, 1975.

See also 198 Ct.Cl. 72, 458 F.2d 66.

F. Trowbridge vom Baur, Washington, D. C., attorney of record, for plaintiff.

Michael J. Rubin, Washington, D. C., with whom was Asst. Atty. Gen. Carla A. Hills, for defendant.

Before COWEN, Chief Judge, and DAVIS, SKELTON, NICHOLS, KASHIWA, KUNZIG and BENNETT, Judges.

ON PLAINTIFF'S AMENDED MOTION FOR SUMMARY JUDGMENT AND DEFENDANT'S SUPPLEMENTAL CROSS–MOTION FOR SUMMARY JUDGMENT.

COWEN, Chief Judge:

We are called upon to decide another issue arising in connection with plaintiff's long-continued and persistent efforts to obtain a decision on the merits by the Postal Service Board of Contract Appeals on plaintiff's appeal from an adverse decision of the contracting officer. After the Board had dismissed plaintiff's appeal as untimely, we held that the Board had not given adequate consideration to the facts and circumstances which might, in the proper exercise of its discretion, authorize it to waive the contractual period for an appeal from the contracting officer's decision. Accordingly, we suspended proceedings pending plaintiff's further pursuit of its administrative remedy through a possible discretionary waiver by the Board of the contractual time limit. Monroe M. Tapper & Associates v. United States, 458 F.2d 66, 198 Ct.Cl. 72 (1972). After holding a hearing, the Board issued its decison on

remand in which it determined that "on the assumption that it has 'power, in proper circumstances, to waive or extend the appeal period specified in the usual disputes clauses,' no facts or circumstances have been presented in this appeal which would warrant or permit the exercise of such assumed power." PSBCA No. 349, 72–2 BCA ¶ 9629.

Thereafter, the case came before Trial Judge Mastin G. White on the parties' cross-motions for summary judgment, and these motions required a Wunderlich Act review of the Board's decision. The trial judge concluded that the refusal of the Board to waive the contractual 30-day time limit constituted action that was arbitrary and an abuse of discretion. He recommended that the parties' cross-motions for summary judgment be denied without prejudice, and that the case be remanded to the Board with instructions for a prompt determination on the merits of the contractor's claim for additional compensation because of the requirement that gravel be used in backfilling trenches for utility lines. The case is before us now on defendant's exceptions to the trial judge's opinion. After an en banc hearing and after considering the arguments and briefs of the parties, we find that the trial judge's determinations based on his review of the administrative record are correct, and we adopt his conclusion of law and his recommendation for remand of the case.

## I

At oral argument there was an indication that there is some confusion by counsel as to the standard that should be used by this court in its review of the latest Board decision. However, any confusion on that point should be dispelled by reference to our decision in Moore-McCormack Lines, Inc. v. United States, 413 F.2d 568, 188 Ct.Cl. 644 (1969). We there held that in cases involving abuse of discretion in the administration of Government contracts, the standards provided in the Wunderlich Act, 41 U.S.C. §§ 321, 322 (1964) apply. In that case, which also dealt with questions of procedure, the court stated that "questions of abuse of discretion are subsumed under the review required (41 U.S.C. § 321) for arbitrariness or capriciousness." 413 F.2d at 583, 188 Ct.Cl. at 669. This is not a situation in which the scope of judicial review is limited by a statute which precludes judicial review, or by one which is drawn in such broad terms that there is no law to apply. Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 410, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971).[1] See also Berger, Administrative Arbitrariness and Judicial Review, 65 Col.L.Rev. 55 (1965).

## II

Under the contract that is involved in the present case, the plaintiff, Monroe M. Tapper and Associates (Tapper), agreed to construct a Post Office and Vehicle Maintenance Facility in Worcester, Massachusetts, according to plans and specifications prepared by the Post Office Department (now the Postal Service), and to lease the completed structure to the Department for a specified term. Tapper was a Minneapolis, Minnesota, real estate developer and investor, and not a builder, and was principally interested in the contract for investment purposes. Consequently, Tapper engaged a general contractor in Worcester, Granger Contracting Co., Inc. (Granger), to do the entire job of construction for a lump-sum price of $4,830,000.

The Worcester architectural firm of C. W. Buckley, Inc. (Buckley), was engaged by the Post Office Department as Architect-Engineer to supervise the construction. During performance of the contract, Buckley and Granger had offices in the same building.

Stephen M. Trich (Trich), an official of the Post Office Department in Washington, D. C., customarily represented

---

1. The Supreme Court also held that under the provisions of the Administrative Procedure Act, the substantial evidence test applies to judicial review of an agency action which is based on a public adjudicatory hearing. Such a hearing was held in this case, and we likewise apply the substantial evidence test.

the Department in handling matters that reached the departmental level in connection with the construction, although a Deputy Assistant Postmaster General was technically the contracting officer. Trich was the Chief of Building Construction in the Bureau of Research and Engineering. He testified that he visited the construction site once a month for the construction progress meeting and that, prior to the meeting, he always went in to see Dragon, Granger's Vice President in charge of engineering, to see whether there was anything he wished to bring out at the meeting; that if Granger was in (two doors away) he would say "hello" to him.

The contract contained the usual "disputes" provision, which gave the "lessor" (Tapper) a 30-day period within which to appeal in writing to the Postmaster General from a final decision rendered by the contracting officer on a dispute arising under the contract.

Tapper took very little interest in the construction process, other than to make a few phone calls to Trich and to sign papers occasionally, as the prime contractor, when requested to do so by Granger and assured by Granger that the papers were in proper order. Postal officials were aware that Granger was the real party in interest concerning construction matters arising in connection with the job, and it was Granger who dealt with these officials on such matters, usually through Buckley. Tapper attended a preconstruction meeting in Worcester on August 8, 1968, with Granger, Trich, and others, where it was agreed that Granger would obtain Post Office Department approval of a project manager, and it was understood by Tapper that change orders over $2,000 should go through Tapper's office. Tapper wrote a letter to Granger on August 19, 1968, authorizing Granger to approve and execute change orders in the amount of $2,000 or less "in my behalf." The letter also stated: "Should change orders be larger than $2,000 the authority for such execution shall be mine."

During the course of the construction, a controversy arose in September 1968 between Granger and Buckley over whether, as contended by Buckley and denied by Granger, the contract specifications required that gravel be used in backfilling trenches for utility lines. The contracting officer's adverse ruling on this dispute was the subject of plaintiff's appeal to the Board.

### III

In our decision of April 14, 1972, 458 F.2d 66, 198 Ct.Cl. 72 (1972), remanding the case to the Board, the court stated that the plaintiff should be permitted to apply to the Board for a further consideration of a discretionary waiver, because the course of defendant's dealings with Granger as the real party in interest may have induced him to believe that he would promptly receive a copy of the contracting officer's final decision and, thus, set in motion a timely appeal. In determining that there was no basis to warrant the exercise of a waiver of the contractual time limit for plaintiff's appeal to the Board, the Board found "there simply is no evidence of a course of direct dealing by respondent [the Government] with Granger in regard to the subject of the backfill material." Plaintiff has characterized this finding as astounding, arbitrary, capricious, and unsupported by substantial evidence. Indeed it is. Our able trial judge, who has had extensive experience in reviewing administrative records in contract cases, found that

> [T]he undisputed evidence before the board showed that all dealings by the Post Office Department relative to the backfill dispute during the crucial period were with Granger, either directly or through Buckley, [defendant's Architect-Engineer], and that the Department did not have any dealings with Tapper concerning that subject up until the receipt on February 26, 1969, of the formal appeal which Tapper signed at the request of Granger.

Moreover, the Board's finding is in direct conflict with the finding which this court made in its decision of April 14, 1972, on the basis of the administrative record of the first Board hearing held on March

17, 1970.[2]. The Board's conclusion is also contrary to its own evidentiary findings on the same question.

A review of the evidence shows that from the very beginning of the construction, the Government dealt directly with Granger as the real party in interest on all matters relating to construction, and particularly on disputes arising between Granger and C. W. Buckley, Inc. [Buckley], the Architect-Engineer whom the Government employed to represent it at the site. Tapper was involved in none of these matters. As he stated in his testimony, "after receiving the award and entering into the contract with the Granger Construction Company to build it, the extent of my concern was paying the bills and making periodic calls to Mr. Trich to see how things were going."

At the beginning of the contract work, Trich requested Granger, not Tapper, to select a project manager and to submit a statement of his qualifications to the Government. Tapper had nothing whatever to do with the selection of the project manager, and no copy of Granger's letter submitting its selection of the project manager was sent to him. Even the Board recognized that this was, of course, a direct dealing between defendant and Granger; it could not do otherwise in the face of the evidence. The Board correctly concluded that this incident, standing alone, was not sufficient to show a course of direct dealing with Granger. However, the Board then chose to ignore all other evidence regarding the Government's direct dealings with Granger on the issue before us.

The uncontroverted evidence shows that the Government's order to use gravel backfill for certain utility trenches was not transmitted to Tapper but was given directly to Granger by Buckley. This was direct dealing, for it cannot be denied that Buckley was the Government's representative at the site.

Thereafter on September 23, 1968, there was a three-way telephone conversation among Granger's vice president and Buckley at Worcester and a representative of the Post Office Department in the Specifications Department in Washington, D. C. In this conversation, Granger's representative, Mr. Dragon, was told that Granger would not receive reimbursement for the gravel used in the earth fill. This, too, was direct dealing with Granger to the complete exclusion of Tapper. The denial was confirmed in a letter dated September 26, 1968, from Mr. Sandlin of the Post Office Department to Buckley. On September 30, 1968, Buckley promptly forwarded a copy of the letter to Granger. In addition, a facsimile of this letter was mailed directly by the Post Office Department to Granger and received by Granger on October 2, 1968.

No copy of either letter was sent by the Post Office Department to Tapper. These letters constitute indisputable documentary evidence of direct dealings between the Post Office Department and Granger to the exclusion of Tapper on the issue here in dispute.

On October 23, 1968, Granger wrote directly to the Post Office Department, requesting a review of Mr. Sandlin's determination and a final decision on the matter.

On November 1, 1968, Mr. Trich returned his copy of the letter with a request that Granger's letter be sent through proper channels (the Architect-Engineer) so that the latter could review and comment on the contents of Granger's request.

At a construction progress meeting held at the site on November 14, 1968, Granger and Buckley made inquiry re-

---

**2.** Among other things, the court found:

"Tapper left almost all of the dealings with the Government, with respect to construction, to Granger—see note 1, *supra*—and the communication between Granger and the defendant (including Buckley, the architect-engineer) was extensive, continuous, and routine. In particular, on the backfill dispute (here involved) the relations were wholly between Granger and the Government, without any participation by or notification to Tapper up to Granger's request for a final decision by the contracting officer." 458 F.2d at 69, 198 Ct.Cl. at 78.

garding "proper channels" for handling the dispute on the backfill, and the minutes of the meeting show that the following advice was given:

On questions of dispute, the final decision is rendered by the Contracting Officer. A request should be submitted from the Contractor [Granger], through the Architect [Buckley], to the P.O.D. Items over $2,000 should be submitted from the Lessor [Tapper] to the Architect to the P.O.D. In the case of a negative decision from the Contracting Officer, the Lessor may appeal the decision. Emergency decisions may be given over the phone from the P.O.D. if the Architect is not available. Respondent's Ex. 1.

On November 14, 1968, immediately following the meeting, Granger, through its vice president, Mr. Dragon, expressed Granger's disagreement with Sandlin's decision in a letter to Buckley and sent by him to the Post Office Department. The letter stated in part:

We would therefore request that you review *our* request and advise us of your final decision * * * We request your final decision in the matter as soon as possible *so that we may take further action if necessary.* [Emphasis supplied]

The Government then clearly waived the requirements stated in the conference of November 14, 1968, by accepting and acting on this request from Granger as a basis for the contracting officer's decision dated December 23, 1968. We regard this action as irrefutable proof of direct dealing by the Government with Granger. This final decision by the contracting officer on the dispute was made solely in response to Granger's written request, quoted above, and without any consultation or communication whatever between the officials of the Post Office Department and Tapper.

The same pattern of direct dealing by the Government with Granger was followed in other disputes, including changes involving more than $2,000, as well as those involving less. In each instance when Granger felt that he was entitled to additional compensation on changes and related matters, the request therefor was submitted first to Buckley, the Architect-Engineer, and was thereafter reviewed by Mr. Trich. If the Government agreed with Granger, a written change order would be signed and sent to Tapper for signature; he would sign it after Granger telephoned him to do so. If there was no agreement, the Post Office Department sent Mr. Trich or Mr. Simpson to the site of the work to negotiate directly with Granger about the price. If these negotiations resulted in an agreement, the Post Office Department would prepare a change order, sign it, mail it to Tapper for signature, and he, in turn, would sign after being advised by telephone to do so by Granger. Up to the point of signing the change orders, Tapper had nothing whatever to do with the negotiations. An illustration of the practice regularly followed was the change involving the embankment at the rear of the Post Office which was accomplished at an increased cost of approximately $15,000; the amount paid Granger was finally negotiated between Granger and Simpson in February 1970. The same thing occurred with the box lobby change involving extra costs of about $14,000; the amount of the additional compensation paid to Granger was finally negotiated between Granger and Simpson.

We emphasize the importance of the Board's arbitrary finding that there was no course of direct dealing between the Government and Granger on the backfill issue. In our opinion, this finding was the false premise which led the Board into making two additional arbitrary findings. The first of these was its conclusion that the Government's action prior to January 9, 1969, was not such as ought to induce Granger to believe that the Government would give him prompt notice of the contracting officer's decision that was sent to Tapper. The second was that delay in filing the appeal was not the result of Granger's reliance on the Government's conduct, but was due to Granger's misplaced reliance on Tapper's conduct, first, in not advis-

ing Granger of the receipt of the final decision, and, subsequently, in denying he had received it.

In our decision remanding the case to the Board, the court provided the following guidelines for the Board to follow in determining whether defendant's dealings with Granger reasonably led Granger to believe that it would receive a copy of the final decision in time to make a timely appeal:

* * * Moreover, even if discretion was exercised, it is clear that the Board focused solely on the conduct and responsibilities of Tapper, not considering Granger's interests or position at all. Although Tapper, as the prime, is the proper and necessary plaintiff and the named contractor, Granger is obviously the real party in interest, except in the formal and technical sense. When purely legal rights are being appraised, such as the timeliness of the appeal, the defendant can rightly insist that the notice had to be filed in Tapper's name and the time began to run when Tapper received the contracting officer's decision. But when the equitable concept of discretion-to-waive is invoked, all the pertinent circumstances must be evaluated, including Granger's role vis-a-vis the Government and the Government's conduct toward and dealings with Granger. 458 F.2d at 70–71, 198 Ct.Cl. at 80.

The Board largely ignored these guidelines and simply closed its eyes to evidence showing that in the main, it was the Government's conduct in its relations with Granger that reasonably led Granger to believe that it would receive a copy of the decision in time to file an appeal in Tapper's name. Since the Board's decision disregarded both the court's guidelines and practically all of the evidence adverse to the Government, we hold that the two findings mentioned above were also arbitrary and constituted an abuse of discretion.

Beginning shortly after Granger submitted the request for a final decision (under date of November 14, 1968),

Granger repeatedly made inquiries of both Buckley and Trich as to what action the Government had taken.

Mr. Trich stated that the decision would be coming from someone higher up, but he assured Granger that a copy would be sent to Buckley as soon as it was issued and that Granger could get a copy of it from Buckley.

The importance of these assurances by Mr. Trich lies in the fact that he prepared the contracting officer's final decision in its entirety, although it was formally signed by the contracting officer. In this, as in all other matters relating to the dispute, Mr. Trich was the "Government" for all realistic and practical purposes in the administration of the contract.

We know now that the contracting officer's decision on the backfill issue was originally typed December 5, 1968 (Mr. Trich's draft) and retyped on December 23, 1968. It bears a date stamp of December 23, 1968. However, we do not know when it was actually mailed or received by Tapper's office. The Board found that Tapper's office received it on or before January 16, 1969.

We think there is no doubt that Mr. Trich assured Granger that a copy of the decision would be sent promptly to Buckley and that Granger would get a copy of it from Buckley. The Board has omitted any reference (and presumably gave no consideration) to Mr. Trich's testimony that he directed his secretary— the same secretary who prepared the envelope for mailing the decision to Tapper—to send a copy at the same time to Buckley. There is no explanation in the record why this was not done, but it is highly probable that if Mr. Trich's instructions had been carried out, Granger would have received a copy of the decision in adequate time to perfect the appeal.

It is undisputed that Tapper's office force consisted of one secretary; that he was on vacation in Arizona at the time the letter was received, and that it was erroneously filed by her in the "Equal Opportunity" file. Prior to leaving on

vacation, Tapper had been receiving numerous routine letters from the Complaints Office of the Equal Opportunity Commission and had paid scant attention to them.

There was nothing about the letter containing the decision dated December 23, 1968, which would have attracted the attention of Tapper's secretary to the fact that this was something other than routine correspondence. The fact that the letter was mislaid by her was due, to a considerable extent, to the Government's failure to comply with Federal Procurement Regulation § 1–1.318–1(b), which states:

> A copy of each contracting officer's decision shall be furnished to the contractor by certified mail, return receipt requested, or by any other method which provides evidence of the date of receipt of the decision of the contractor.

Mr. Trich, himself, admitted that the decision should have been sent by certified mail.

The Board relied heavily on the January 9, 1969, meeting, at which time Mr. Trich told Granger's representative that the contracting officer had rendered an adverse decision and that a copy had been mailed to Tapper. Since the letter had not been sent by certified mail as required by the regulations, Mr. Trich was unable to say whether or when Tapper received it. However, Trich again promised that a copy would be sent to Buckley. At that time, Mr. Trich was informed by Granger's representative that Granger intended to appeal the decision. In order to prepare the appeal, he needed and was entitled to a complete written copy of the decision—the copy that Mr. Trich had several times promised to send to Buckley where Granger could obtain it.

As it developed, the assurances of Mr. Trich, although doubtlessly made in good faith, proved to be unreliable. Buckley did not receive anything resembling a final decision until February 3, 1969, some six weeks after the December 23, 1968, decision date. Although this document resembled a "final decision," it was unsigned and had blank spaces for the concurrences of a number of people in the Department. These features made it reasonably seem to be merely a draft of a later-to-be released final decision. Confused by this correspondence and by Tapper's denial of any receipt of a final decision, Granger discussed the matter with Mr. Trich on February 5, 1969, at the regular monthly construction meeting. It was at this conference that Mr. Trich accomplished the final act that lulled Granger into inaction. Because of the Post Office Department's failure to transmit Tapper's copy of the final decision by certified mail, return receipt requested, Mr. Trich did not know and therefore could not say whether Tapper had actually received a copy of the final decision. However, Mr. Trich did state that if Tapper had received the decision, the 30-day appeal period had already expired. At the same time, he said that if Tapper had not received the decision, the 30-day period for the appeal would run from February 3, 1969, the day Granger received the copy from Buckley. The indefinite advice then given Granger by Mr. Trich, plus the confusing nature of the draft copy, certainly lulled Granger into inaction until February 25, 1969.

Applying the standards we have adopted for review of the Board's decision, we hold that the Board's decision on the "direct dealing" issue was contrary to practically all the evidence in the record and in conflict with the court's findings on the same question. Such an arbitrary determination constitutes an abuse of discretion and should be set aside. Berger, Administrative Arbitrariness and Judicial Review, 65 Col.L. Rev. 55, 58–59 (1965). Long ago in Federal Radio Comm'n v. Nelson Bros. Bond & Mortgage Co., 289 U.S. 266, 277, 53 S.Ct. 627, 633, 77 L.Ed. 1166 (1933), the Supreme Court declared:

> A finding without substantial evidence to support it—an arbitrary or capricious finding—does violence to the law. It is without the sanction of the authority conferred. And an inquiry

into the facts before the commission, in order to ascertain whether its findings are thus vitiated, belongs to the judicial province and does not trench upon, or involve the exercise of, administrative authority. Such an examination is not concerned with the weight of evidence or with the wisdom or expediency of the administrative action.

In ICC v. Louisville & Nashville R. R., 227 U.S. 88, 33 S.Ct. 185, 57 L.Ed. 431 (1913), the Government attempted to convince the Supreme Court that a decision of the Interstate Commerce Commission was conclusive and "could not be set aside, even if the holding was wholly without substantial evidence to support it." The Court's disagreement with this argument was stated as follows:

> But the statute gave the right to a full hearing, and that conferred the privilege of introducing testimony, and at the same time imposed the duty of deciding in accordance with the facts proved. *A finding without evidence is arbitrary and baseless.* And if the government's contention is correct, it would mean that the Commission had a power possessed by no other officer, administrative body, or tribunal under our government. It would mean that where rights depended upon facts, the Commission could disregard all rules of evidence, and capriciously make findings by administrative fiat. Such authority, however beneficently exercised in one case, could be injuriously exerted in another, is inconsistent with rational justice, and comes under the Constitution's condemnation of all arbitrary exercise of power. [Emphasis supplied] 227 U.S. at 91, 33 S.Ct. at 186.

The Board's findings on the other crucial issues in the case—those relating to the defendant's dealings with Granger that led him to believe that he would receive a copy of the contracting officer's decision in time to appeal—are also arbitrary. These findings are arbitrary, because the Board ignored important evidence, particularly the testimony of Mr. Trich, and largely disregarded the guide-lines set forth in the court's decision of remand. The Board's failure or refusal to consider such evidence was arbitrary and capricious. Hemby v. United States, 185 Ct.Cl. 140, 150 (1968). On this phase of the case, the following language of the Supreme Court in Morgan v. United States, 298 U.S. 468, 480, 56 S.Ct. 906, 911, 80 L.Ed. 1288 (1936), seems particularly appropriate:

> There must be a full hearing. There must be evidence adequate to support pertinent and necessary findings of fact. * * * *Facts and circumstances which ought to be considered must not be excluded.* [Emphasis supplied]

Since we have concluded that the refusal of the Board to waive the contractual 30-day time limit in this instance constituted arbitrary action and was an abuse of discretion, the decision of the Board is reversed and the case remanded as provided in Part IV hereof.

### IV

At oral argument plaintiff contended, as it had before the trial judge, that since its administrative remedy has been proven to be both inadequate and unavailable, plaintiff is entitled to a de novo court trial on the breach of contract claim, and further that plaintiff should thereafter be permitted to sue in this court for damages resulting from defendant's breach of its contractual obligation to provide an adequate, available, and reasonable administrative remedy. The trial judge's decision on this phase of the case was as follows:

> It is necessary to determine in the present case, therefore, whether the administrative remedy has been shown to be inadequate with respect to the backfill claim. It has been noted previously in this opinion that, over a period of years, Granger (acting through Tapper) endeavored unsuccessfully to obtain a final administrative decision on the merits of the backfill claim. This attempt failed in the first instance because of the 1970 decision by the Post Office Board of Contract Ap-

peals that the appeal from the contracting officer's decision was untimely, and it was thwarted again by the arbitrary 1972 action of the Postal Service Board of Contract Appeals in refusing to waive the contractual 30-day time limit with respect to this appeal. It has been argued, with considerable persuasiveness, that the administrative remedy has therefore proved to be inadequate. On the other hand, the circumstances just recited are deemed insufficient to justify the presumption that the Postal Service Board of Contract Appeals, upon a remand, would delay action unduly or act arbitrarily on the merits of the backfill claim. Cf. United States v. Anthony Grace & Sons, Inc., *supra*, 384 U.S. [424] at 430 [86 S.Ct. 1539, 16 L.Ed.2d 662].

Plaintiff took no exception to any part of the trial judge's decision, and we adopt his determination as the basis for our decision. Accordingly, it is ordered that the parties' cross-motions for summary judgment are denied without prejudice and the case is hereby remanded to the Postal Service Board of Contract Appeals pursuant to Pub.L. 92–415, 86 Stat. 652 and Rule 149(b) for a period not to exceed six months from this date. The Board is directed to conduct such further de novo hearings as may be necessary to decide, on the merits, whether the contractor is entitled to additional compensation—and if so, the amount of such compensation—because of the requirement that gravel be used in backfilling trenches for utility lines; and to render a prompt final administrative decision on the question. Further proceedings in the court shall be stayed during the period fixed in this order of remand. Plaintiff's attorney of record is designated to advise the court, by letter to the trial judge, of the status of the remand proceedings, and such advice shall be given at intervals of 90 days or less, commencing with the date of this decision.

SKELTON, Judge (dissenting):

My disagreement with the majority opinion can best be understood perhaps by considering our different approaches to the problem before us and the difference in our views as to the present posture of the case. After a great deal of reflection and study, I have concluded that the majority opinion is in error in requiring the discretionary decision of the Board to be supported by substantial evidence.

We held in Maney Aircraft Parts, Inc. v. United States, 453 F.2d 1260, 197 Ct.Cl. 159 (1972); Maney Aircraft Parts, Inc. v. United States, 479 F.2d 1350, 202 Ct.Cl. 54 (1973); Moran Bros., Inc., v. United States, 346 F.2d 590, 171 Ct.Cl. 245 (1965); Schlesinger v. United States, 383 F.2d 1004, 181 Ct.Cl. 21 (1967), and Monroe M. Tapper & Assocs. v. United States, 458 F.2d 66, 198 Ct.Cl. 72 (1972) that the Board may in the exercise of its discretion waive the 30 day time limit for a contractor to appeal to the Board from a decision of a contracting officer.

However, in the instant case the majority opinion seems to ignore the discretion vested in the Board by this court in the above cited decisions, and now establishes a different requirement to the effect that the Board's decision must be supported by substantial evidence. In my opinion, the terms "exercise of discretion" and "supported by substantial evidence" are contradictory if *required* to exist at the same time. While it is true that as a matter of fact a discretionary decision of the Board may be supported by substantial evidence in a given case by happenstance, on the other hand it may not be. If the decision is required to be supported by substantial evidence, as the majority opinion holds, there is no discretion left to the Board. It appears that the majority opinion in this case takes away the discretion that we held in the above cited cases was vested in the Board.

The word "discretion" as defined in Webster's Third New International Dictionary as follows:

At will; according to one's judgment or pleasure; the latitude of decision within which a court or judge decides questions arising in a particular case

not expressly controlled by fixed rules of law according to the circumstances and according to the judgment of the court or judge (as in suspension of a sentence or the amount of a fine).

The same dictionary defines the word "discretionary" as follows:

Left to discretion or individual judgment; exercised at one's own discretion.

Roget's International Thesaurus, Third Edition, gives the following as synonyms to the word "discretion."

Option, will, at will, free will, choice, free decision, volition, own volition, as one thinks best, and as it seems good or best.

It is clear that the holding of the majority that the Board's discretionary decision must be supported by substantial evidence is contrary to the plain meaning of the words "discretion" and "discretionary." As shown above by the quotation from the dictionary, a decision of a judge suspending a sentence or a fine in a criminal case is a discretionary act on his part. It would be unthinkable to say that his decision must be supported by substantial evidence. Our case is no different. Both situations involve decisions that are equitable in nature. We so held as to a Board's decision in a situation like the one presently before us in Maney Aircraft Parts, Inc. v. United States, *supra*, where we said:

* * * The decision of the Board on this problem *is essentially equitable rather than legal*, with an objective to do justice under the circumstances. * * * [Emphasis supplied.] [479 F.2d at 1353, 202 Ct.Cl. at 60.]

The majority opinion recognizes that the Board's decision is equitable in nature by saying that the instant case was remanded to the Board so that it might exercise its *discretion* as to whether nor not a waiver should be granted, and quoting from our remand decision:

* * * But when the *equitable* concept of discretion-to-waive is invoked, all the pertinent circumstances must be evaluated, * * *. [Emphasis

supplied.] [458 F.2d at 71, 198 Ct.Cl. at 80.]

Yet the majority opinion imposes on the Board the *legal* test of substantial evidence in order for the Board to reach an *equity* decision.

The majority opinion is apparently based on the assumption that the claim of plaintiff that he is entitled to a waiver as to his late filing of his appeal is a claim that arose *under* the contract. This is shown by the reliance of the majority on the case of Moore-McCormack Lines, Inc. v. United States, 413 F.2d 568, 188 Ct.Cl. 644 (1969) which involved a suit by shipowners to force the Maritime Board to reveal the procedures it had used in arriving at the amount of ship subsidies the shipowners were entitled to *under* their contracts with the Government. We there held that the plaintiffs were entitled to this information *under* their contracts and that by reason thereof the standards of the Wunderlich Act (41 U.S.C. §§ 321–22 (1964)) applied. This is shown by the following statement from the opinion in that case.

Once a contract has been made, though, the case is entirely different. Both parties have commitments which restrict their freedom of action. Each has surrendered valuable consideration, and is legally entitled to his *quid pro quo*. At this point, the Wunderlich Act, 41 U.S.C. §§ 321–22 (1964), enters to guarantee at least a minimal measure of judicial review of administrative determinations under *"any* contract entered into by the United States" (emphasis added). The express requirement that "a question of law" be open for court examination under every federal agreement (41 U.S.C. § 322) covers most, if not all, major issues of procedure, and, of course, questions of abuse of discretion are subsumed under the review required (41 U.S.C. § 321) for arbitrariness or capriciousness. The court has held that operating-differential subsidy agreements are to be treated, especially with respect to abuse of discre-

tion, *like other government contracts* (Pacific Far East Line, Inc. v. United States, 394 F.2d 990, 998, 184 Ct.Cl. 169, 184 (1968)), and there is no reason for a different handling of construction-differential subsidy contracts. At a minimum, the Board is therefore responsible to the courts for legal errors and abuse of discretion—at least for procedural deficiencies. [Emphasis supplied.] [Footnote omitted.] [*Id.* 413 F.2d at 583, 188 Ct.Cl. at 669.]

The situation in that case was completely different to that in the instant case. There the plaintiffs were suing to enforce rights to subsidies they had under their contracts. Here the contract of the plaintiff has no provision whatever with reference to a waiver for late filing of an appeal. In fact, it is not even mentioned in the contract. Since the claim for waiver did not arise *under* the contract, the Wunderlich standards do not apply, and the reliance of the majority on the case of Moore-McCormack Lines, Inc. v. United States, *supra,* is misplaced.

If the majority opinion holds that the plaintiff's waiver claim arose *under* his contract and is redressable under it, which appers to be the case, we would have to dismiss his case for failure to exhaust his administrative remedies. This is so because the only way his claim for waiver could arise under his contract would be through the disputes clause in the contract. That clause provides very specifically that:

> * * * [A]ny dispute concerning a question of fact arising under this contract which is not disposed of by agreement shall be decided by the contracting officer, who shall reduce his decision to writing and mail or otherwise furnish a copy thereof to the Contractor. The decision of the Contracting Officer shall be final and conclusive unless [the Contractor appeals within 30 days].

It is undisputed that the plaintiff did not present any request to the contracting officer for an extention or enlargement of time for the filing of his appeal,

nor any request for a waiver of the 30 day time limit for filing an appeal, and, of course, the contracting officer never rendered an opinion on any of such matters. Consequently, if plaintiff's claim for a waiver of the appeal time limit arose under the disputes clause, he failed to exhaust his administrative remedies. Plaintiff's counsel was no doubt aware of this fact when he stated very emphatically in his oral argument that the plaintiff's claim before the court *did not arise under the disputes clause.*

The majority opinion cites Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971) in support of its substantial evidence test. In my opinion, that case is authority against the plaintiff on this point, as well as on others, instead of in his favor. There the Secretary of Transportation in the exercise of discretion, designated a highway through a public park and authorized federal funds for that purpose. The plaintiffs sued to set aside his decision on the grounds that his action was not authorized under the Department of Transportation Act of 1966 (49 U.S.C. § 1653) and the Federal-Aid Highway Act of 1968 (23 U.S.C. § 138) if there was in existence a feasible and prudent alternate route. The question was whether or not the Secretary had abused his discretion in making his decision and issuing the order. The Court held that the substantial evidence standard did not apply, saying in connection with the contentions of the plaintiffs:

> * * * First, they contend that the "substantial evidence" standard of § 706(2)(E)[1] must be applied. In the alternative, they claim that § 706(2)(F)[2] applies and that there must be a *de novo* review to determine if the Secretary's action was "unwarranted by the facts." *Neither of these standards is, however, applicable.* [Emphasis supplied.] [401 U.S. at 414, 91 S.Ct. at 822.]

The court not only rejected the substantial evidence test, but also adopted a

---

1. 5 U.S.C. § 706(2)(E)

2. 5 U.S.C. § 706(2)(F)

"clear error of judgment" test, which is far less favorable to the plaintiff in the instant case than the substantial evidence test that the majority opinion advocates. In this connection the Supreme Court held:

> * * * Section 706(2)(A) requires a finding that the actual choice made was not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (1964 ed., Supp. V). To make this finding the court must consider whether the decision was based on a consideration of the relevant factors *and whether there has been a clear error of judgment.* Jaffe, *supra,* at 182. See McBee v. Bomar, 296 F.2d 235, 237 (CA6 1961); In re Josephson, 218 F.2d 174, 182 (CA1 1954); Western Addition Community Organization v. Weaver, 294 F.Supp. 433 (ND Cal. 1968). See also Wong Wing Hang v. Immigration and Naturalization Serv., 360 F.2d 715, 719 (CA2 1966). Although this inquiry into the facts is to be searching and careful, *the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency.* [Emphasis supplied.] [401 U.S. at 416, 91 S.Ct. at 823.]

The Court also said:

> Even though there is no *de novo* review in this case and the Secretary's approval of the route of I–40 *does not have ultimately to meet the substantial-evidence test,* * * *. [Emphasis supplied.] [401 U.S. at 415, 91 S.Ct. at 823.]

In that case the court did state that in certain narrow and specifically limited situations (not present here), the substantial evidence standard could be used. The Court said:

> * * * In certain *narrow, specifically limited situations,* the agency action is to be set aside if the action was not supported by "substantial evidence." * * * 5 U.S.C. §§ 706(2)(E), (F) (1964 ed., Supp. V).
>
> * * * * * *

Review under the substantial-evidence test is authorized *only* when the agency action is taken pursuant to a rulemaking provision of the Administrative Procedure Act itself, 5 U.S.C. § 553 (1964 ed., Supp. V), or when the agency action is based on a public adjudicatory hearing. See 5 U.S.C. §§ 556, 557 (1964 ed., Supp. V). * * [Emphasis supplied] [401 U.S. at 414, 91 S.Ct. at 822.]

The majority opinion in the instant case says that a public adjudicatory hearing was held by the Board. I do not agree. There was no public hearing by the Board. In speaking of a public adjudicatory hearing, the Supreme Court had in mind the public hearings described in sections 556 and 557 of the Administrative Procedure Act (5 U.S.C. §§ 556–57) which deal with full-fledged hearings on the *merits and hearings provided by statute.* Neither type of hearing was had in the instant case, nor in *Citizens to Preserve Overton Park, Inc., supra,* where the Supreme Court refused to use the substantial evidence standard in reviewing the Secretary's discretionary decision.

The decision of the Court in Bell Lines, Inc. v. United States, 306 F.Supp. 209 (S.D.W.Va.1969) aff'd per curiam, 397 U.S. 818, 90 S.Ct. 1517, 25 L.Ed.2d 804 (1970) appears to be very much in point. In that case suit was filed to set aside an order of the Interstate Commerce Commission granting temporary authority to certain motor freight lines to expand their services in eastern United States. The Congress vested authority in the Commission by 49 U.S.C. § 310a. to grant, *in its discretion,* such temporary authority for carrier service. The court held that it had authority to review the action of the Commission by reason of the provisions of the Administrative Procedure Act, saying:

> * * * Section 706 [of the Act] defines scope of review including review of agency action which is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." * * * [*Id.* at 212.]

The court held further that the substantial evidence rule did not apply, saying:

> To recapitulate, the Court restates its disposition of the questions presented, as follows:
>
> 1. The Court has jurisdiction to review the orders of the Interstate Commerce Commission granting temporary authority to motor carriers under 49 U.S.C.A. Section 310a.
>
> 2. The scope of judicial review is limited, under the state of the record here, to a determination of whether the Commission's orders are arbitrary or capricious, in abuse of discretion or for some other reasons contrary to law.
>
> 3. The *"substantial evidence" rule*, applicable in the judicial review of many Commission orders relating to grants of certificates of convenience and necessity, *is not applicable* in grants of temporary authority to motor carriers under 49 U.S.C.A. Section 310a. [Emphasis supplied.] [*Id.* at 218.]

The court went on to hold that there was no abuse of discretion by the Commission in issuing the order. The decision was affirmed by the Supreme Court without opinion.

One may well ask how the standard for judicial review of a discretionary decision of an agency or board can be determined. The Supreme Court in the *Overton Park* case, *supra*, said that the answer lies in the Administrative Procedure Act (The Act). The Court said:

> * * * But the existence of judicial review is only the start: *the standard for the review must also be determined. For that we must look to § 706 of the Administrative Procedure Act, 5 U.S.C. § 706 (1964 ed., Supp. V)*, which provides that a "reviewing court shall * * * hold unlawful and set aside agency action, findings, and conclusions found" not to meet six separate standards.[30] In all cases agency

[30] To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

> "(1) compel agency action unlawfully withheld or unreasonably delayed; and
>
> "(2) hold unlawful and set aside agency action, findings, and conclusions found to be—
>
> "(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
>
> "(B) contrary to constitutional right, power, privilege, or immunity;
>
> "(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
>
> "(D) without observance of procedure required by law;
>
> "(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or
>
> "(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court. * * *"
> [Emphasis supplied.] [401 U.S. at 413–14, 91 S.Ct. at 822.]

action must be set aside if the action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or if the action failed to meet statutory, procedural, or constitutional requirements. 5 U.S.C. §§ 706(2)(A), (B), (C), (D) (1964 ed., Supp. V). * * *

The applicable portions of the above quoted Act in the instant case are sections (2) and (2)(A). They provide that a reviewing court shall hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. In my opinion, this is the standard or test that should be used in the instant case in reviewing the Board's discretionary decision. We quoted the pertinent parts of the above Act in our decision in *Moore-McCormack Lines, Inc.*, *supra*, and, although not spelled out in so many words, we indicated, at least by inference, that the standard set forth in the above Act should be used by a reviewing court if the claim of the plaintiff did not arise *under* a contract. *See also* Jones v. Freeman, 400 F.2d 383 (8th Cir. 1968);

Scanwell Laboratories, Inc. v. Shaffer, 137 U.S.App.D.C. 371, 424 F.2d 859 (1970); and Bell Lines, Inc. v. United States, *supra.*

Having established the proper test or standard we are required to apply in reviewing the discretionary decision of the Board as prescribed by the Act, I will now consider whether or not the Board's decision is arbitrary, capricious, or an abuse of discretion.

We held in Maney Aircraft Parts, Inc. v. United States, 479 F.2d 1350, 202 Ct.Cl. 54 (1973) in remanding that case to the Board to exercise its discretion as to whether or not it should grant the plaintiff a waiver of the 30-day time limit for its appeal (which was the same situation as exists here) we said:

> * * * In exercising its discretion, the Board should consider all facts and circumstances, including the conduct of both the contractor and the government and arrive at a decision that it considers fair, just, and equitable to both parties. [*Id.* 479 F.2d at 1354, 202 Ct.Cl. at 61.]

In the instant case, the findings of the Board show that it followed the above procedure and considered all the facts and circumstances, including all of the detailed facts in the majority opinion as well as those discussed below, many of which overlap with those set forth in the majority opinion, and arrived at a decision in the exercise of its discretion that it considered fair, just, and equitable to both parties.

The majority opinion discusses the facts in great detail. This is not a trial *de novo*, but a review of the discretionary decision of the Board. In this posture of the case we are not a fact finding body. That function is reserved to the Board. However, it may be helpful to comment on the procedure used by the Board after our remand of the case, and on the pertinent facts mentioned by the Board in its decision.

From an examination of the "Decision" of September 7, 1972, I am satisfied that the Board considered the relevant evidence, including, as directed by the court, "Granger's role vis-a-vis the Government and the Government's conduct toward and dealings with Granger." With the court's direction obviously in mind, the Board held a prehearing conference at which the issue to be tried was defined to the satisfaction of both parties.[3] It then conducted a further hearing with a view to considering "all evidence—particularly evidence not previously offered—relating to the pertinent circumstances involved."

The decision first reviews the Government-Granger relationship in the pre-construction phase, after the contract had been awarded Tapper and after Tapper had engaged Granger to perform the construction work. It notes Granger's testimony that one of the things that established a course of conduct of direct dealing between him and the Government was that on August 14, 1968, he wrote directly to Trich concerning the appointment of F. A. Nilson as Granger's project manager and that Sandlin wrote, on August 21, 1968, directly to Granger approving Nilson's appointment. It points out, however, that at the pre-construction meeting held in Worcester on August 8, 1968, at which Tapper himself, Granger, Trich and others were present, it was agreed that Granger would obtain Post Office Department approval of a project manager.

The decision recites the history of the backfill dispute: the telephone call of September 23, 1968, to the Post Office Department made by the Architect-Engineer at Granger's request; the oral answer that reimbursement would be denied; the letter of September 26, 1968, from the Post Office Department to the Architect-Engineer confirming the oral denial of reimbursement, a copy of which Granger received from the Architect-Engineer on October 1, 1968; Granger's receipt on October 2, 1968, directly from the Post Office Department, of what amounted to a copy of its letter of

---

3. It was: "Are there any circumstances, including the matter of whether Granger was not itself lulled into inaction by the Government's failure to send it a copy of the final decision, which would warrant the Board's entertaining this appeal on its merits?"

September 26 to the Architect-Engineer; Granger's letter of October 23, 1968, directly to the Post Office Department, showing courtesy copies to Tapper and the Architect-Engineer and requesting a final decision; the return of this letter to Granger with a one-sentence letter by Trich to submit the request "to proper channels"; the November 14, 1968, construction conference at which oral instructions were given Granger's representative about the proper handling of disputes, including:

> Items over $2,000 should be submitted from the Lessor [Tapper] to the Architect to the P.O.D. In the case of a negative decision, the Lessor may appeal the decision.

the fact that on the same day (November 14, 1968) Granger wrote about the backfill matter to the Architect-Engineer, the letter showing a courtesy copy to Tapper (which he received) and requesting a final decision; and the transmittal by the Architect-Engineer of Granger's letter to the Post Office Department on November 19, 1968. Statements concerning the foregoing communications and minutes of the November 14 conference are accompanied by references to the record and exhibits. Referring to the above recitation, the Board said: "There simply is no evidence of a *course* of *direct* dealing by Respondent with Granger in regard to the subject of the backfill material." [Emphasis supplied.] Inasmuch as any "course of dealing," particularly of a formal nature (i. e. "the paperwork"), could be said to have been *indirect*, namely: from Granger to the Architect-Engineer to the Post Office Department, or from the Department to the Architect-Engineer to Granger, the Board's statement can hardly be regarded as erroneous.[4]

Next the decision considers the matter of whether Granger was lulled into inaction by the Government's [Post Office Department's] delay in sending Granger a copy of the final decision.[5] It points to the conflict between the parties over whether Granger's representative was told by Trich on January 9, 1969, the date of the January construction progress meeting, that the Contracting Officer's final decision had been mailed to Tapper and that it was unfavorable, namely: Trich's recollection that Granger's representative was so advised at that time vs. Granger's claim that it was not until sometime near February 3, 1969, that Trich told him of the issuance of the adverse decision. The Board accepts Trich's recollection "as the more reliable," because: (1) Trich had the monthly construction progress meeting to serve as a guide; and (2) Granger testified that about halfway through the period between the time the final decision was requested (November 14, 1968) and the date of his receipt of a copy of the final decision (February 3, 1969), Trich told him that the decision (which was dated December 23, 1968) had been mailed to Tapper and that the Architect-Engineer would get a copy of it; so that "by Granger's own statement he learned of the final decision at, or very shortly

---

4. R. J. Lamoureux, who was employed by the Architect-Engineer as Project Architect throughout the period of the dispute, testified: "We were the intermediary between Granger and Tapper and the Post Office."

5. The decision also considers Granger's belief that *he* had thirty days from the date on which *he* received the *copy* of the decision within which to give the necessary notice of intent to appeal, describing Granger's testimony in support of this belief, and then setting forth the reasons why he knew or should have known that the thirty-day appeal period began to run as of the date of receipt by Tapper of the Contracting Officer's final decision (e. g. the fact that reference was made to the disputes clause in Granger's letters of October 23 and

November 14, 1968, requesting a final decision; advice he received at the November 14, 1968, construction conference; and his knowledge that Tapper had to sign the appeal papers). It concludes that there is no adequate foundation for plaintiff's assertion that the Government was "inexcusably careless" and "neglectful" because it had sent the final decision only to Tapper. Such a conclusion is reasonable, and I also note that the contract between Tapper and Granger provides that, in event of a dispute covered by the "disputes clause" of the Post Office Department General Conditions, Granger, within the time permitted will through Owner [Tapper], and in Owner's name, pursue the procedure for disputes provided in such clause * * *."

after, the time of its issuance." The Board also said:

> The fact that on February 3 Granger had in its possession a copy of the decision letter showing that it had been signed, and the additional fact that Granger had been advised of the decision by Trich on January 9, were more than adequate to have alerted Granger that on February 3 the appeal period was nearing its close.

In its earlier opinion, this court noted that Granger's explanation for the delay in filing an appeal was twofold: (1) his confusion resulting from the nature of the copy of the final decision [showing two dates—date typed and date stamped, with blank spaces for six concurrences], and his question of whether an official letter had ever been sent; and (2) Tapper's insistence that he had not received any final decision. In response the Board states that the copy of the decision letter should not have confused Granger since the markings were of the same character as the copy of the letter Granger received on October 2, 1968; further, that the delay in filing the appeal notice was not a result of reliance on respondent's conduct, but, rather, of Granger's misplaced reliance on Tapper's conduct, first in not advising Granger of the decision letter, and subsequently in denying he had received it. At the hearing preceding the Board's last decision, Granger himself testified as follows with respect to his first call to Tapper about receipt of the decision:

Q. And you telephoned Mr. Tapper?

A. That's right.

Q. And presumably, if Mr. Tapper had said yes, I've received it, you would have said file an appeal, is that correct?

A. I would have sent through the language for Mr. Tapper to file the appeal, yes, immediately.

Q. You knew the appeal had to come from Mr. Tapper, then didn't you?

A. I knew that he had to sign the papers but we were going to prepare the language.

Thus, it is apparent that even if Granger had relied on receiving a copy of the final decision promptly after it was mailed to Tapper, he would "immediately" have sent the language for Tapper to file the appeal if, at the time of his first call to Tapper "in late January 1969," he had been correctly informed by Tapper that the final decision had been received. On the basis that Granger seasonably asked Tapper (first after Trich told him in January that the final decision had been issued, and again on February 4, 1969) whether he had received the decision, it should be concluded that the Board's finding that Tapper's negative answers occasioned the failure to file the appeal by February 15, 1969, the deadline, was reasonably based on fact.[6]

When the appeal was finally filed, it was filed by Tapper, the prime contractor, and not by Granger, the subcontractor. This fact shows conclusively that Tapper and Granger both knew all the time that any appeal had to be made by Tapper.

We are not empowered to substitute our judgment on the facts for that of the Board. The Supreme Court made that perfectly clear in Citizens to Preserve Overton Park, Inc. v. Volpe, *supra*, when it said:

> * * * The court is not empowered to substitute its judgment for that of the agency. [401 U.S. at 416, 91 S.Ct. at 824.]

---

6. Plaintiff's argument that failure of the Post Office Department to send the final decision by certified mail pursuant to Federal Procurement Regulation § 1–1.318–1(b) was responsible for improper filing in Tapper's office, without it being called to his attention, is pure speculation as there is no evidence to that effect. Moreover, this regulation is designed merely to facilitate proof by the Government of actual receipt, which is moot here since the Board found when Tapper received the decision and Tapper has not challenged this finding. Moreover, the regulation was for the benefit of the Government and not the contractor. It could not possibly make the Government responsible for the way Tapper ran his office nor for his negligence in this case.

Nevertheless, the detailed treatment of the facts in the majority opinion, together with the decision of the majority overturning the decision of the Board on the facts, make it appear that the majority is substituting its opinion on the facts for that of the Board. I think this is error. It is true that there are facts in the case that are favorable to the plaintiff, but on the other hand, there are facts favorable to the Government. If these facts were before us in the first instance, there could be room for disagreement and we might reach a result different to that of the Board. But this is not the case. The Board has considered all the facts pro and con, and, in the exercise of its discretion, has decided in effect that the plaintiff has failed to show good cause or a justifiable excuse for failing to file his appeal on time as required by us in Maney Aircraft Parts, Inc. v. United States, 479 F.2d 1350, 202 Ct.Cl. 54 (1973), and for that reason refused to grant the waiver of late filing.[7] The plaintiff has not shown that the decision of the Board is arbitrary, capricious, or an abuse of discretion. In my opinion, the majority opinion is in error in holding to the contrary.

This is the first case where a discretionary decision of a Board not to grant a waiver of the 30-day time limit for an appeal by a contractor has been overturned by this court. The precedent established by the majority opinion should be a matter of grave concern to both contractors and the Government alike with respect to future contracts.

It should be pointed out that, although there is no privity of contract between the Government and the subcontractor Granger, the majority opinion holds that because of dealings between the contracting officer and the subcontractor, the real party in interest is the subcontractor. Because of these dealings, the majority ignores the provisions of the contract between Tapper, the prime contractor, and the Government, and nulli-

fies the 30-day time period for appeal by the contractor in the contract, and, in effect, rewrites the contract so as to give the contractor Tapper extra time to file his appeal (how much extra time is not indicated). The decision of the majority that the subcontractor is the real party in interest and by reason of dealings between him and the contracting officer the provision in the contract between the prime contractor and the Government limiting the appeal period for the contractor to 30 days is in effect nullified, is a very serious matter. It could well be very harmful to contractors as well as to the Government in the performance and administration of future contracts. This is true because in the performance of most contracts, especially those involving construction, the work on the job is done by subcontractors. These subcontractors have, in many cases, daily contacts with the contracting officers for the purposes of seeking advice, holding conferences, and obtaining interpretation of plans and various types of assistance. The full cooperation of the contracting officers is vital. In the future, because of the decision here, contractors may find that contracting officers will be reluctant to have dealings with subcontractors for fear that in case of a dispute, a court, as in the instant case, may hold that the subcontractors are the real parties in interest, notwithstanding the fact that there is no privity of contract between them and the Government. Such lack of cooperation could cause all kinds of problems and hamper, and perhaps delay, the performance of the contracts, and this would be detrimental to the Government.

Furthermore, the 30-day time limit for appeals in the disputes clause could well be rendered meaningless and unenforceable, as it has been in this case. Copies of decisions of contracting officers may have to be sent to all subcontractors to guard against the possibility that otherwise they might be held to be the real

7. On remand in the Maney case, the Board found in exercising its discretion that the plaintiff had not shown good cause nor a justifiable excuse for failing to file its appeal with- in the 30-day time limit, and we approved the decision of the Board by order entered on the 16th day of January, 1975.

parties in interest, which could require a waiver of the 30-day time limit for an appeal, as in the instant case.

It seems to me by reason of the foregoing, that the majority opinion goes much further than merely holding that the Board abused its discretion in failing to find that the plaintiff has not shown good cause or a justifiable excuse for the late filing of his petition.

For all of the foregoing reasons, I would hold that the plaintiff has failed to show that the Board's discretionary decision not to waive the 30-day time limit for plaintiff's appeal was arbitrary, capricious, or an abuse of discretion and I would affirm the decision of the Board, deny plaintiff's motion for summary judgment, and grant defendant's cross-motion for summary judgment and dismiss plaintiff's petition.